UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HOLLY NOEL, Derivatively on Behalf of THE FIRST MARBLEHEAD CORPORATION, | ) ) ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| DANIEL MEYERS, KENNETH KLIPPER, PETER S. DROTCH, GEORGE G. DALY, WILLIAM D. HANSEN, THOMAS P. EDDY, DORT A. CAMERON III, NANCY Y. BEKAVAC, STEPHEN E. ANBINDER, PETER B. TARR, WILLIAM R. BERKLEY, and HENRY CORNELL, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| -and- | ) | |
| | ) | |
| THE FIRST MARBLEHEAD CORPORATION, a Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this shareholder derivative complaint against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant The First Marblehead Corporation ("First Marblehead" or the "Company") against certain of its officers and directors for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.  These wrongs have damaged First Marblehead's reputation, goodwill, and standing in the capital markets, and have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      The Individual Defendants (as defined herein) are responsible for a series of improper statements about the Company's financial health and business prospects.  Defendants repeatedly claimed that the Company's 2009 sale of one of its trust certificates (the "Trust Certificate")[1] created substantial tax benefits for First Marblehead, including upwards of nearly $200 million in tax returns for previously paid taxes, as well as the elimination of approximately $430 million in future tax obligations relating to residuals associated with the Trust Certificate.  As the defendants knew or were reckless in not knowing, these statements were misleading when made.  With the approval of First Marblehead's Board of Directors (the "Board"), the Company structured the transaction so that First Marblehead retained certain benefits and control over the Trust Certificate after the purported sale.  Pursuant to various tax and accounting regulations, as a result of the Company's retained control and benefits, the Trust Certificate remained an asset of First Marblehead and the Company

---

[1] The Trust Certificate is an ownership entitlement in NC Residual Owners Trust (the "Owners Trust").  The Owners Trust and its wholly-owned subsidiary, NC Owners LLC f/k/a The National Collegiate Funding, LLC, together own certificates of beneficial ownership interests of various securitization trusts (the "NCSLT Trusts"), and each of those NCSLT Trusts owns a portfolio of private credit student loans.

was not eligible for the tax refund or future tax benefits that the Individual Defendants claimed would result from the sale.

3.    In April 2010, the Internal Revenue Service ("IRS") commenced an audit of First Marblehead's tax returns for fiscal 2007 through 2010, including a review of the tax treatment of the sale of the Trust Certificate.  In public filings signed by each of  the Individual Defendants, the Company disclosed the audit.  Nevertheless, for the next three years they repeatedly implied that the IRS audit was merely the result of certain triggering thresholds, and unlikely to result in significant liabilities.

4.    Then on August 15, 2013, First Marblehead shocked the market by announcing that the Company expected to receive a Notice of Proposed Adjustment ("NOPA") from the IRS that would: (i) seek to disallow the loss that generated the tax refunds previously received by the Company; and (ii) require the Company to include in its tax returns certain taxable income associated with the Trust Certificate.  The announcement further disclosed that the proposed tax liability related to its IRS audit was estimated to amount to a staggering *$300 million, plus interest*. The massive $300 million tax liability was nearly double the Company's $174.9 million market capitalization on the day of the announcement, nearly *750% more than the Company's total revenue for all of fiscal year 2012* of approximately $40.4 million, and more than *674% greater than the Company's total revenue for all of fiscal year 2013* of approximately $44.4 million.[2]  More, the interest on the $300 million tax adjustment began accruing on September 16, 2010, the last day after First Marblehead's 2009 tax return was due.  Assuming an applicable interest rate of Federal short-term rate plus 5% compounded daily, the current interest due as of October 14, 2013, is

---

[2] First Marblehead's fiscal years end on June 30.

approximately *$45.9 million*.  The Company is currently accruing interest at approximately *$50,000 per day*.

5.       On this news, First Marblehead's stock plunged over 36.3%, erasing more than $63.5 million in market capitalization in one day.  The Company's stock price has continued to plummet since that date, and First Marblehead was recently forced to disclose that it is now at risk of being delisted by the New York Stock Exchange ("NYSE") because the average closing price of its common stock fell below the NYSE's continued listing standard of $1.00 per share over a consecutive thirty-trading-day period.

6.       In addition, as a direct result of the defendants' wrongdoing, the Company is the subject of at least one securities class action lawsuit, filed in the United States District Court for the District of Massachusetts (the "Securities Action").  The Securities Action poses the risk of hundreds of millions of dollars in damages to the Company.

7.       Notwithstanding the enormous damage to First Marblehead arising from the federal and state law violations, First Marblehead's Board has not, and will not commence suit against defendants for their breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.  Thus, plaintiff brings this action to protect the Company's interests and hold its wayward fiduciaries accountable for their wrongdoing.

## JURISDICTION AND VENUE

8.       This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) First Marblehead maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to First Marblehead occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

11.      Plaintiff Holly Noel was a shareholder of First Marblehead at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current First Marblehead shareholder. Plaintiff is a citizen of California.

### Nominal Defendant

12.      Nominal Defendant First Marblehead is a Delaware corporation with principal executive offices located at 800 Boylston Street, 34th Floor, Boston, Massachusetts. Accordingly,

First Marblehead is a citizen of Delaware and Massachusetts. First Marblehead is a specialty finance company that focuses on the education financing marketplace in the United States. The Company provides loan programs on behalf of its lender clients for K-12, undergraduate and graduate students, and for college graduates seeking to refinance private education loan obligations, as well as tuition planning, tuition billing, refund management, and payment technology services. First Marblehead's product and service offerings are part of a change in its revenue model that has been implemented since fiscal 2009 with a focus on fee-based revenues. The Company's long-term success depends on the continued development of four principal revenue lines: partnered lending, banking services, capital markets, and fee-for-service.

**Defendants**

13.     Defendant Daniel Meyers ("Meyers") is First Marblehead's Chairman of the Board and has been since May 2010 and Chief Executive Officer ("CEO") and a director and has been since September 2008. Defendant Meyers was also First Marblehead's President from September 2008 to August 2013; CEO, Chairman of the Board, and a director from 1994 to September 2005; and President from November 2004 to September 2005. He is a co-founder of the Company. Defendant Meyers is named as a defendant in the Securities Action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendant Meyers knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's conference calls, press releases, and public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) accepted millions of dollars' worth of undeserved bonuses and stock awards. First Marblehead paid defendant Meyers the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2013 | $2,728,000 | - | - | - | $411,841 | $3,139,841 |
| 2012 | $820,000 | - | - | - | $518,861 | $1,338,861 |
| 2011 | $800,000 | - | - | - | $11,075 | $811,075 |
| 2010 | $100,001 | $2,000,000 | $4,104,000 | - | $13,228 | $6,217,229 |
| 2009 | $1 | - | - | $16,191,760 | $10,811 | $16,202,572 |

Defendant Meyers is a citizen of Massachusetts.

14.     Defendant Kenneth Klipper ("Klipper") is First Marblehead's Chief Financial Officer and a Managing Director and has been since September 2008.  Defendant Klipper was also First Marblehead's Treasurer and Chief Accounting Officer from November 2006 to April 2011 and Senior Vice President, Finance from March 2005 to September 2008.  Defendant Klipper is named as a defendant in  the Securities Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Klipper knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's conference calls, press releases, and public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  First Marblehead paid defendant Klipper the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2013 | $401,700 | $141,600 | $11,973 | $555,273 |
| 2012 | $399,750 | $72,800 | $13,825 | $486,375 |
| 2011 | $390,000 | - | $15,208 | $405,208 |
| 2010 | $390,000 | $546,000 | $18,221 | $954,221 |
| 2009 | $371,250 | - | $22,610 | $393,860 |

Defendant Klipper is a citizen of Massachusetts.

15.     Defendant Peter S. Drotch ("Drotch") is a First Marblehead director and has been since October 2003.  Defendant Drotch is also Chairman of First Marblehead's Audit Committee and has been since at least September 2008.  Defendant Drotch reviewed and approved the sale of the

Trust Certificate as constructed and knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  First Marblehead paid defendant Drotch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2013 | $135,000 | $10,400 | $492 | $145,892 |
| 2012 | $136,000 | $11,200 | $1,762 | $148,962 |
| 2011 | $137,000 | $23,900 | $1,831 | $162,731 |
| 2010 | $107,000 | $7,980 | $1,683 | $116,663 |
| 2009 | $122,500 | $9,900 | $1,130 | $133,530 |

Defendant Drotch is a citizen of Massachusetts.

16.     Defendant George G. Daly ("Daly") is a First Marblehead director and has been since September 2002.  Defendant Daly was also a member of First Marblehead's Audit Committee from at least September 2008 to July 2012, and a member of the Compensation Committee from at least September 2008 to August 2013.  Defendant Daly is expected to resign as a First Marblehead director at the Company's annual shareholder meeting scheduled for November 12, 2013.  Defendant Daly reviewed and approved the sale of the Trust Certificate as constructed and knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) granted defendant Meyers millions of dollars' worth of undeserved bonuses and stock awards.  First Marblehead paid defendant Daly the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2013 | $82,000 | $10,400 | $1,211 | $93,611 |
| 2012 | $89,000 | $11,200 | $3,865 | $104,065 |
| 2011 | $90,000 | $23,900 | $1,404 | $115,304 |
| 2010 | $62,000 | $7,980 | $2,873 | $72,853 |

| | | | | |
|---|---|---|---|---|
| 2009 | $52,000 | $9,900 | $2,344 | $64,244 |

Defendant Daly is a citizen of Vermont.

17.     Defendant William D. Hansen ("Hansen") is a First Marblehead director and has been since July 2003. Defendant Hansen was also Chairman of First Marblehead's advisory council from July 2003 to April 2007. Defendant Hansen is a member of First Marblehead's Audit Committee and has been since at least October 2012; was also a member of the Audit Committee from at least September 2008 to August 2010; and is a member of the Compensation Committee and has been since at least September 2008. Defendant Hansen reviewed and approved the sale of the Trust Certificate as constructed and knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) granted defendant Meyers millions of dollars' worth of undeserved bonuses and stock awards. First Marblehead paid defendant Hansen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2013 | $86,000 | $10,400 | - | $96,400 |
| 2012 | $83,000 | $11,200 | $3,126 | $97,326 |
| 2011 | $85,000 | $23,900 | $5,001 | $113,901 |
| 2010 | $62,000 | $7,980 | $2,429 | $72,409 |
| 2009 | $53,000 | $9,900 | $5,884 | $68,784 |

Defendant Hansen is a citizen of Virginia.

18.     Defendant Thomas P. Eddy ("Eddy") is a First Marblehead director and has been since May 2010. Defendant Eddy is also a member of First Marblehead's Audit Committee and has been since May 2010. Defendant Eddy knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of

the Company's disclosures.  First Marblehead paid defendant Eddy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2013 | $85,000 | $10,400 | $95,400 |
| 2012 | $86,000 | $11,200 | $97,200 |
| 2011 | $87,000 | - | $87,000 |
| 2010 | $11,000 | $29,900 | $40,900 |

Defendant Eddy is a citizen of Massachusetts.

19.     Defendant Dort A. Cameron III ("Cameron") is First Marblehead's Lead Director and has been since July 2012 and a director and has been since December 1995.  Defendant Cameron is also a member of First Marblehead's Compensation Committee and has been since at least September 2008 and was Chairman of that committee from at least September 2008 to about October 2011.  Defendant Cameron reviewed and approved the sale of the Trust Certificate as constructed and knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) granted defendant Meyers millions of dollars' worth of undeserved bonuses and stock awards. First Marblehead paid defendant Cameron the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2013 | $132,000 | $10,400 | $142,400 |
| 2012 | $83,000 | $11,200 | $94,200 |
| 2011 | $83,000 | $23,900 | $106,900 |
| 2010 | $53,000 | $7,980 | $60,980 |
| 2009 | $43,000 | $9,900 | $52,900 |

Defendant Cameron is a citizen of New York.

20.     Defendant Nancy Y. Bekavac ("Bekavac") is a First Marblehead director and has been since May 2010.  Defendant Bekavac is also Chairman of First Marblehead's Audit Committee and has been since at least October 2012 and a member of that committee and has been since May

2010. Defendant Bekavac knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. First Marblehead paid defendant Bekavac the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2013 | $82,000 | $10,400 | $1,658 | $94,058 |
| 2012 | $83,000 | $11,200 | $784 | $94,984 |
| 2011 | $83,000 | - | $1,304 | $84,304 |
| 2010 | $10,000 | $29,900 | - | $39,900 |

Defendant Bekavac is a citizen of Washington, D.C.

21.     Defendant Stephen E. Anbinder ("Anbinder") was First Marblehead's Vice Chairman of the Board and a director from May 2002 to November 2010; President from December 1995 to May 2002; Treasurer from May 2002 to June 2003; and Group Head, Capital Markets from 1992 to March 2003. Defendant Anbinder also served as a consultant to First Marblehead from June 2005 to December 2007. He is a co-founder of the Company. Defendant Anbinder reviewed and approved the sale of the Trust Certificate as constructed and knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's conference calls, press releases, and public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. First Marblehead paid defendant Anbinder the following compensation as a director:

| Fiscal Year | All Other Compensation | Total |
|---|---|---|
| 2009 | $17,093 | $17,093 |

Defendant Anbinder is a citizen of Florida.

22.     Defendant Peter B. Tarr ("Tarr") was First Marblehead's Chairman of the Board from October 2005 to May 2010; a director from August 2005 to May 2010; Vice Chairman of the Board

from August 2005 to October 2005; and General Counsel from July 2005 to August 2008. Following his resignation in May 2010, defendant Tarr also served as a temporary at-will employee of First Marblehead, providing consulting, advisory, and related services as requested by the Lead Director on behalf of the Company.  Defendant Tarr reviewed and approved the sale of the Trust Certificate as constructed and knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's conference calls, press releases, and public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Defendant Tarr is a citizen of Massachusetts.

23.     Defendant William R. Berkley ("Berkley") was First Marblehead's Lead Director from January 2004 to June 2012; a director from December 1995 to June 2012; and Interim Chairman of the Board from September 2005 to October 2005.  Defendant Berkley was also a member of First Marblehead's Compensation Committee from at least September 2008 to about October 2011.  Defendant Berkley reviewed and approved the sale of the Trust Certificate as constructed and knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures; and (iii) granted defendant Meyers millions of dollars' worth of undeserved bonuses and stock awards. First Marblehead paid defendant Berkley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2012 | $133,000 | $11,200 | $144,200 |
| 2011 | $133,000 | $23,900 | $156,900 |
| 2010 | $105,000 | $7,980 | $112,980 |
| 2009 | $93,000 | $9,900 | $102,900 |

Defendant Berkley is a citizen of Connecticut.

24.     Defendant Henry Cornell ("Cornell") was a First Marblehead director from January 2008 to January 2012.  Defendant Cornell reviewed and approved the sale of the Trust Certificate as constructed and knowingly or recklessly: (i) made improper statements in the Company's public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  First Marblehead paid defendant Cornell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $80,000 | - | - | $80,000 |
| 2011 | $80,000 | $23,900 | - | $103,900 |
| 2010 | $50,000 | $7,980 | $1,138 | $59,118 |
| 2009 | $40,000 | $9,900 | - | $49,900 |

Defendant Cornell is a citizen of New York.

25.     The defendants identified in ¶¶13-14 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶13, 15-24 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶15-18, 20 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶13-24 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe First Marblehead and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage First Marblehead in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of First Marblehead and not in furtherance of their personal interest or benefit.

27.     To discharge their duties, the officers and directors of First Marblehead were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of First Marblehead were required to, among other things:

(a)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, prospects, and liabilities, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     ensure that no inaccurate financial information about First Marblehead was released to the public that would tend to artificially inflate First Marblehead's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(d)     remain informed as to how First Marblehead conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

28.     In addition to the above, as stated in the Company's Corporate Governance Guidelines, First Marblehead's directors were required to "review[] and approve[] material transactions and commitments not entered into in the ordinary course of business."  Thus, the Board

was required to review and approve the sale of the Trust Certificate because the transaction was material and not entered into in the ordinary course of business.

**Breaches of Duties**

29.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of First Marblehead, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

30.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements regarding the Company's tax liabilities.  Due to these defendants' illegal actions and course of conduct, the Company wasted its corporate assets and is now the subject of the pending Securities Action.  As a result, First Marblehead has expended, and will continue to expend, significant sums of money.

31.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of First Marblehead, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, First Marblehead has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

32.     Under the Audit Committee Charter, in effect since at least August 13, 2007, the Audit Committee Defendants, defendants Daly, Drotch, Eddy, Hansen, and Bekavac, owed additional specific duties to First Marblehead to assist the Board in overseeing, among other things:

(i) the integrity of the Company's financial statements; and (ii) the Company's systems of internal controls regarding finance, accounting, and compliance with related legal and regulatory requirements. The Audit Committee Defendants were further required to review the type and presentation of information to determine whether to recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K, and "discuss generally the types of information to be disclosed in the Company's earnings press releases, as well as in financial information and earnings guidance provided to analysts, rating agencies and others."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

34.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of First Marblehead, regarding the Individual Defendants' management of the Company operations and the prospects of the Company's business; and (iii) enhance the Individual Defendants' executive and directorial positions at First Marblehead and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

35.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue misleading financial statements.

36.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

37.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**FIRST MARBLEHEAD'S TAX ACCOUNTING COMES UNDER INCREASED
SCRUTINY AMID CHANGING ACCOUNTING RULES**

39.     First Marblehead is a specialty finance company that focuses on the education financing marketplace in the United States.  The Company provides loan programs on behalf of its lender clients for kindergarten through university graduate programs, and for college graduates

seeking to refinance private education loan obligations, as well as tuition planning, tuition billing, refund management, and payment technology services.

40.     Beginning in September 2006, First Marblehead disclosed that the Financial Accounting Standards Board ("FASB")[3] would soon adopt new interpretations for accounting for uncertainty in income taxes, specifically pertaining to positions taken on tax returns.  As a result, with the Board's approval, the Company adopted the new interpretation in July 2007, which set a minimum recognition threshold that a tax position is required to meet before being recognized in the financial statements.  Thus, after July 2007, under FASB Interpretation No. 48 ("FIN 48") and First Marblehead's own standards, the Company was only allowed to recognize the tax benefit from an uncertain tax position "if it [was] *more likely than not that the tax position will be sustained upon examination by the taxing authorities*, based on the technical merits of the tax position."  Similar statements were consistently included in the Company's Forms 10-K and Forms 10-Q filed with the U.S. Securities and Exchange Commission ("SEC") between 2006 and 2008 and signed by defendants Klipper, Tarr, Anbinder, Berkley, Cameron, Cornell, Daly, Drotch, and Hansen.  These red flags alerted the Individual Defendants of changing accounting standards and the need for heightened awareness surrounding the Company's compliance with these new policies under GAAP in the United States.

---

[3] FASB is the organization that creates Generally Accepted Accounting Principles ("GAAP"). GAAP are the common set of accounting principles, standards and procedures that companies use to compile their financial statements, and are imposed on companies so that investors have a minimum level of consistency in the financial statements they use when analyzing companies for investment purposes. GAAP cover such things as revenue recognition, balance sheet item classification, and outstanding share measurements. Companies are expected to follow GAAP rules when reporting their financial data via financial statements.

41.     In November 2007, First Marblehead began disclosing various IRS examinations of the Company's local, state, and federal income tax returns. The Company's Forms 10-Q and Forms 10-K filed with the SEC between November 9, 2007 and November 10, 2008 disclosed that these examinations included the years ending June 30 for 2003 through 2008.  Also, in about 2007, the Company began facing a multi-year review of certain tax matters by the Massachusetts Commissioner of Revenue and the Appellate Tax Board ("ATB") related to the tax treatment of the Company's former subsidiary, GATE Holdings, Inc. ("GATE Holdings"), the original holder of the Trust Certificate.  The repeated scrutiny of First Marblehead's income tax payments and policies created an additional heightened awareness for the Individual Defendants of potential tax-related issues within the Company, and further put the Individual Defendants on notice that the Company's tax matters were being carefully monitored and scrutinized.   Despite the above, as detailed below, the Individual Defendants repeatedly caused or allowed the Company to misrepresent the likelihood that the purported tax benefits of the Trust Certificate sale would ultimately pass IRS scrutiny.

**FIRST MARBLEHEAD SELLS THE TRUST CERTIFICATE AND RETAINS CONTROL OVER IT**

42.     In 1996, First Marblehead incorporated GATE Holdings as a wholly-owned subsidiary of the Company.  Through March 2009, GATE Holdings held the Company's title to residual interests in certain securitization trusts.  On March 31, 2009, the Company statutorily converted GATE Holdings into a trust and then sold the Trust Certificate to VCG Owners Trust, a newly formed Delaware statutory trust.  With approval of the Board, the Company structured the sale to allow First Marblehead to retain control over the trust and retain certain benefits related to the trust.

43.     The Company's continued control over the Trust Certificate is important in determining whether First Marblehead should have continued to record it as an asset on the

Company's financial statements.  According to Concepts Statement No. 6, *Elements of Financial Statements*, issued by the FASB, an asset is defined by three essential characteristics, including that:

> (a) it embodies a probable future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash in-flows, (b) a particular entity can obtain the benefit and control others' access to it, and (c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred.

44.     Here, the Individual Defendants caused or allowed the transaction to be structured so that the Company retained control over the terms of its potential resale, the competitive use of its underlying assets, and its management.  The Company was further guaranteed future economic benefit in the form of an advisory fee pursuant to an Asset Services Agreement that the potential future purchaser would have to pay to terminate.  Because the Company retained benefits and control over the Trust Certificate, First Marblehead should have recognized the Trust Certificate as an asset event after its sale.  In addition, pursuant to Internal Revenue Code §61(a)(15), the Company should have continued to recognize the residuals from the Trust Certificate as part of the its taxable income. Despite this, the Individual Defendants ignored the clear tax implications resulting from First Marblehead's continuing benefits and position of control.  The Individual Defendants instead repeatedly claimed that First Marblehead would receive nearly $195 million in tax refunds and eliminate approximately $430 million in future tax liabilities from the sale of the Trust Certificate.  These statements were misleading.

### THE COMPENSATION COMMITTEE IMPROPERLY GRANTS MILLIONS OF DOLLARS IN BONUSES TO DEFENDANT MEYERS FOR PURPORTEDLY ELIMINATING SUBSTANTIAL TAX BURDENS AS A RESULT OF THE SALE OF THE TRUST CERTIFICATE

45.     On October 5, 2010, in a Proxy Statement on Form DEF 14A filed with the SEC, the Company disclosed that the Compensation Committee, comprised of defendants Cameron, Daly, Berkley, and Hansen, granted defendant Meyers a "special bonus" of $2 million.  This bonus was

granted in part because defendant Meyers purportedly "significantly improve[ed] the viability of the Company, as demonstrated by … the potential elimination of an estimated $430,000,000 in additional taxes over the remaining life of the NCSLT Trusts."

46.     The Proxy Statement also revealed that the Compensation Committee granted defendant Meyers 1.2 million fully vested stock units worth over $4.1 million.  As with the above bonus, the stock units were granted in part as a result of the potential elimination of an estimated $430 million in taxes.  The stock units were also granted because the sale of the Trust Certificate purportedly provided the Company with tax refunds of over $176.6 million for fiscal 2009.

47.     The purported sale of the Trust Certificate, however, did not eliminate the Company's tax liabilities or provide significant tax refunds.  Indeed, the Company will likely owe the IRS approximately $300 million plus interest.  This massive tax liability also severely jeopardizes the Company's viability, as it is more than doubles the Company's current combined cash, cash equivalents, and short-term investments, and approximately seven times greater than the Company's average total annual revenue for the past two fiscal years.

48.     At the time of the above grants, defendants Cameron, Daly, Berkley, and Hansen knew or were reckless in not knowing that the purported tax benefits from the sale of the Trust Certificate were likely to be rejected by the IRS.  The windfall granted to defendant Meyers was therefore improper.

## IMPROPER STATEMENTS

49.     While emphasizing the purported substantial tax benefits of the Trust Certificate sale, the Individual Defendants misrepresented or failed to disclose that: (i) the IRS was unlikely to allow the Company's tax treatment for its sale of the Trust Certificate and similarly situated securities; (ii)

such treatment exposed the Company to substantial liability, threatening the future viability of the Company; and (iii) the Company lacked adequate internal controls over financial reporting.

50.     The Company disseminated its first improper statement on April 6, 2009.  On that date, the Company announced the sale of its ownership interest in the Trust Certificate.  The announcement misrepresented that the sale would result in significant monetary benefits for the Company, including: (i) a recapture of a "significant portion" of the $195 million in taxes that the Company previously paid on residual interests; and (ii) the elimination of approximately $430 million in tax obligations over the remaining life of the residuals.  Defendant Meyers further boasted that the transaction would "significantly enhance [the Company's] unrestricted cash."  The press release further noted that the Company would retain rights to additional structural advisory fees and continue to serve as administrator of the NCSLT Trusts, but did not disclose that the retention of benefits made it highly unlikely that the purported resulting tax benefits would pass IRS scrutiny. The announcement stated, in relevant part:

> The sale is expected to generate a cash refund for taxes previously paid, as the Company has been required to pay taxes on the expected residual cash flows from the NCSLT Trusts before it actually receives those cash flows. Prior to this transaction, the company has paid in excess of $195 million on taxable income associated with their interests in the NCSLT residuals over the past 7 years. The Company estimates that it would be required to pay approximately $430 million in additional taxes over the remaining life of the residuals, with approximately $370 million to be paid prior to the residuals generating sufficient annual cash flows to offset the tax payments. As a result of the transaction, the Company expects to eliminate any tax obligations from these residuals in their entirety.

> The refund is expected to be received by the Company in 2009 and 2010.

> *   *   *

> First Marblehead continues to have rights to additional structural advisory fees from the NCSLT Trusts and will continue to publish on its website its management assumptions as well as static pool data regarding performance of these trusts. In addition, First Marblehead Data Services, Inc. will continue to serve as administrator of the NCSLT Trusts.

Daniel Meyers, First Marblehead's Chief Executive Officer and President, said, "Management is pleased to have completed this transaction, which will significantly enhance our unrestricted cash. With respect to the residual interests, the Company has paid income taxes on these residual interests without receiving any cash from these trusts. By completing this transaction, we expect not only to stop the cash burn from these tax payments, but also to recapture a significant portion of the taxes that the Company has paid to date on these residuals. In addition, we will assist the Purchaser with a host of portfolio management and data services throughout the life of the NCSLT Trusts, for which we expect to receive contractual fees. This ensures that First Marblehead's interests continue to be aligned with those of the bondholders of these trusts."

51.     On April 28, 2009, the Company issued a press release reporting results for the quarter ended March 31, 2009. The Company reported a net loss of $140.7 million, or $1.42 per share, and total revenues of ($130.6) million resulting from the sale of the Trust Certificate. The Company also reported $169.9 million in income taxes receivable and no income taxes payable. The press release again improperly stated that the Company expected to generate a cash refund for the taxes previously paid. The press release described the tax implications of the Trust Certificate sale as follows:

The company ended the quarter with $184.8 million in cash, cash equivalents and investments. The sale of NC Residuals Owners Trust is expected to generate a cash refund for taxes previously paid, and the company recorded a net income tax receivable of approximately $170.0 million at March 31, 2009. Net operating cash usage for the quarter ended March 31, 2009 was approximately $13.5 million compared to approximately $15.0 million for the prior quarter.

52.     On May 8, 2009, First Marblehead filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2009. The Form 10-Q reaffirmed the Company's financial results announced on April 28, 2009. The Form 10-Q also boasted that as a result of the sale of the Trust Certificate, the Company's near-term financial condition and liquidity were significantly approved, and that the sale was expected to generate upwards of $195 million tax return and eliminate approximately $430 million in future taxes. These statements were incorrect. The Form 10-Q stated, in relevant part:

As a result of the sale of the Trust Certificate, the Company reversed $117,719 of deferred tax assets recorded as of December 31, 2008 that pertain to temporary differences associated with its residual interests. The sale of the Trust Certificate is expected to change the Company's estimated taxable income for the year, to a taxable loss, which may allow the Company to carry back the net operating losses generated by the sale to previous years for Federal income tax purposes. Accordingly, the Company recorded a $177,366 income tax receivable as of March 31, 2009.

During the second quarter of fiscal 2009, the deferred tax asset continued to grow due primarily to the taxable income generated by the Company's service receivables. The Company determined that a valuation allowance was necessary for certain deferred tax assets associated with its service receivables. As such, a valuation allowance totaling $6,433 was recorded during the second quarter of fiscal 2009. The previously recorded valuation allowance was reversed during the third quarter of fiscal 2009 due to the sale of the Trust Certificate. The Company has determined that a valuation allowance is not necessary for the remaining deferred tax assets, as it is more likely than not that these assets will be realized through future reversals of existing temporary differences, and through future taxable income. The Company will continue to review the recognition of deferred tax assets on a regular basis.

Included in the income tax receivable balance at March 31, 2009, were $21,627 of unrecognized tax benefits of which $14,058, if recognized, would favorably affect the effective income tax rate. The Company recognizes interest accrued related to unrecognized tax benefits in income tax expense. The Company recognizes penalties, if any, in income tax expense. During the first nine months of fiscal 2009, the Company accrued interest of approximately $341 and had approximately $2,197 accrued for interest and no amount accrued for the payment of penalties at March 31, 2009.

\* \* \*

*Sale of the Trust Certificate.* On April 6, 2009, we announced the sale of the Trust Certificate, representing our ownership interest in NC Residuals Owners Trust, formerly known as GATE Holdings, Inc., to affiliates of Vanquish Capital Management LLC. We believe the sale of the Trust Certificate has significantly improved our near-term financial condition and liquidity. NC Residuals Owners Trust owned, directly and indirectly, certain certificates, which we refer to herein as the Trust Certificate, of beneficial ownership interests, which we refer to herein as Residuals, of the NCSLT Trusts. The sale is expected to generate a cash refund for taxes previously paid, as we have been required to pay taxes on the expected residual cash flows from the NCSLT Trusts before we actually receive those cash flows. Over the past seven years, we have paid more than $195 million on taxable income associated with the Residuals. In addition, we estimate that we would have been required to pay approximately $430 million in additional taxes over the remaining life of the Residuals, with approximately $370 million to be paid prior to the Residuals generating sufficient annual cash flows to offset the tax payments. As a

result of the transaction, we expect to eliminate any tax obligations from the Residuals in their entirety. The refund is expected to be received during fiscal 2010.

53.     The Form 10-Q included required certifications pursuant to the Sarbanes-Oxley Act

of 2002 ("SOX"), signed by defendants Meyers and Klipper, who certified the following:

1.     I have reviewed this Quarterly Report on Form 10-Q of The First Marblehead Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the registrant and have:

   a.)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably

likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a.)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

54.      On August 17, 2009, the Company issued a press release reporting quarterly and annual results for the period ended June 30, 2009.  The Company reported a net loss of $36.1 million, or $0.36 per share, on revenues of $11.6 million for the fourth quarter ended June 30, 2009, and a net loss of $363 million or $3.66 per share, on revenues of ($290 million).  The Company also reported income taxes receivable of $166.4 million, and no income taxes payable.  Although unlikely to pass muster from the IRS, the press release again touted the purported tax benefits of the Trust Certificate sale, stating, in relevant part:

The company ended the quarter with $167.2 million in cash, cash equivalents and investments. The sale of NC Residuals Owners Trust and the net operating losses are expected to generate a cash refund for taxes previously paid, and the company recorded an income tax receivable of approximately $166.4 million at June 30, 2009.

55.      On September 3, 2009, First Marblehead filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2009.  The Form 10-K was signed by defendants Meyers, Klipper, Tarr, Anbinder, Berkley, Cameron, Cornell, Daly, Drotch, and Hanson, and reaffirmed the Company's previously announced financial results.  The Form 10-K included SOX required certifications, signed by defendants Meyers and Klipper, stating that information contained in the Annual Report fairly presented, in all material respects, the financial condition and results of

operations of the Company.  In commenting on its potential income tax liabilities, the Form 10-K misstated that the sale of the Trust Certificate would likely improve First Marblehead's financial condition and liquidity, that it would generate a cash refund for income taxes previously paid, and was expected to eliminate approximately $430 million in additional taxes over the remaining life of the residuals.  The Form 10-K stated, in relevant part:

> In addition, as of March 31, 2009, we sold the trust certificate, or Trust Certificate, of NC Residuals Owners Trust, which held our residual interests in The National Collegiate Student Loan Trusts, which we refer to in this annual report as the NCSLT Trusts. The NCSLT Trusts held substantially all of the [The Education Resources Institute, Inc. ("TERI")]-guaranteed private education loans that we had previously securitized. The sale of the Trust Certificate is expected to generate a refund for income taxes previously paid and eliminate certain of our future tax liabilities, which would have had a material negative effect on our financial condition and liquidity. As a result of this sale, we are no longer entitled to receive residual cash flows from the NCSLT Trusts, and our financial results for fiscal 2009 included a write-down of our residuals receivables of $134.5 million as a result of the transaction. We continue to have rights to additional structural advisory fees and will earn asset servicing fees from the NCSLT Trusts, as well as additional structural advisory fees and residuals from certain trusts other than the NCSLT Trusts.
>
> *   *   *
>
> Effective March 31, 2009, we completed the sale of the Trust Certificate, representing our ownership interest in NC Residuals Owners Trust, in a transaction intended to improve our financial condition and liquidity. The sale of the Trust Certificate is expected to generate a cash refund for income taxes previously paid, as we have been required to pay income taxes on the expected residual cash flows from the NCSLT Trusts in excess of what we have actually received. In addition, we estimate that we would have been required to pay approximately $430 million in additional taxes over the remaining life of these residuals, with approximately $370 million to be paid prior to the residuals generating sufficient annual cash flows to offset the tax payments. As a result of the transaction, we expect to eliminate any tax obligations from these residuals.  The U.S. federal and state income tax consequences are complex and uncertain. The Internal Revenue Service or a state taxing authority could challenge our tax positions in connection with the transactions, even after we receive any tax refunds. If such a challenge were successful, in whole or in part, we may not receive or keep a refund for taxes previously paid, or we may not eliminate our tax obligations relating to the residuals. In either case, our near-term financial condition and liquidity would be materially adversely affected. In addition, any investigation, audit or suit relating to the sale, including any such proceeding brought by the Internal Revenue Service, could result in substantial costs.

* * *

We remain focused on preserving capital and maximizing liquidity in these challenging market conditions. During fiscal 2009, we received $132.7 million in gross proceeds from an equity financing, and we greatly reduced our annual cash expenditure requirements through reductions in headcount, consolidation of office space and other cost saving initiatives that began in fiscal 2008. In addition, as of March 31, 2009, we sold the Trust Certificate, which represented our residual interests in substantially all of the TERI-guaranteed private education loans that we had previously securitized. As a result of this transaction, we expect to generate a refund for income taxes previously paid and eliminate certain of our future tax liabilities, which would have had a material negative effect on our financial condition and liquidity. Also, we are no longer entitled to receive residual cash flows from the NCSLT Trusts, which represented substantially all of our residuals receivables; however, we continue to have rights to additional structural advisory fees and will earn asset servicing fees from the NCSLT Trusts, as well as additional structural advisory fees and residuals from certain trusts other than the NCSLT Trusts.

56.     On October 26, 2009, the Company issued a press release reporting results for the quarter ended September 30, 2009.  The Company reported a net loss of $94.1 million, or $0.95 per share, income taxes receivable of $159 million.  In addition, the press release touted that First Marblehead received a $176.9 million refund from the IRS for taxes previously paid and that the Company had approximately $475 million of cash, cash equivalents, and investments on a consolidated basis.  The press release failed to disclose that a substantial portion of the income taxes receivable and the tax refund would likely need to be returned to the IRS.  The press release stated, in relevant part:

> The company ended the quarter with $176.9 million in cash, cash equivalents and investments. On October 1, 2009, the company received $176.6 million from the Internal Revenue Service as a refund for federal taxes previously paid. On October 16, 2009 the company received proceeds of $121.5 million upon the sale of a portfolio of private student loans held by its bank subsidiary. Following receipt of the tax refund and portfolio sale proceeds, the company had approximately $475 million of cash, cash equivalents and investments on a consolidated basis.

57.     On November 6, 2009, First Marblehead filed its Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2009.  The Form 10-Q reaffirmed the Company's financial results announced on October 26, 2009, and included SOX certifications substantially

similar to the certifications described *supra*, signed by defendants Meyers and Klipper. The Form

10-Q noted that, in part, the sale of the Trust Certificate resulted in more than $176,636 in tax

refunds in October 2009. The Form 10-Q again stated that the sale of the Trust Certificate was

expected to eliminate certain future tax liabilities, in turn eliminating what would have been a

material negative effect on the Company's financial condition and liquidity. The Form 10-Q also

implied that the Trust Certificate sale actually reduced financial uncertainties. These statements

were misleading when made. The Form 10-Q stated, in relevant part:

> Prior to fiscal 2009, we structured and facilitated the securitization of private
> education loans generated by our clients through a series of bankruptcy remote,
> special purpose statutory trusts. Through the securitization process, the trusts
> obtained loans from the originating lenders or their assignees, which relinquished to
> the trust their ownership interest in the loans. The debt instruments issued by the
> trusts to finance the purchase of these private education loans are obligations of the
> trusts, not obligations of us or the originating lenders or their assignees. For our past
> securitization services, we are entitled to receive additional structural advisory fees
> from the trusts over time. Effective March 31, 2009, we sold the trust certificate
> (Trust Certificate) of our subsidiary NC Residuals Owners Trust, formerly known as
> GATE Holdings, Inc., a statutory trust that owned certain certificates of beneficial
> ownership interests, also known as residuals, of the NCSLT Trusts. The NCSLT
> Trusts held substantially all of the private education loans previously securitized by
> us and guaranteed by The Education Resources Institute, Inc. (TERI), a not-for-profit
> organization. As a result of the sale, we are no longer entitled to receive residual cash
> flows from the NCSLT Trusts. However, we continue to be entitled to receive
> residual cash flows from other trusts, and we are entitled to receive asset servicing
> fees for our services that support the purchasers' ownership of the Trust Certificate.
> In addition, during fiscal 2009, we began to receive service fees for standalone
> services for loan origination and default prevention and collections services.

*   *   *

> **During fiscal 2009, we implemented a plan to adjust our business model and
> address some of the uncertainties facing us. We made major changes in senior
> management, significantly reduced our operating expenses and sold the Trust
> Certificate.** The sale of the Trust Certificate, coupled with operating losses for fiscal
> 2009, generated a refund on October 1, 2009 from the Internal Revenue Service
> (IRS) for income taxes previously paid of $176,636 and is expected to eliminate
> certain future tax liabilities, which would have had a material negative effect on our
> financial condition and liquidity.

*   *   *

As a result of the sale of the Trust Certificate effective March 31, 2009, as well as our operating losses for fiscal 2009, we recorded an income tax receivable for federal income taxes paid on prior taxable income. On October 1, 2009, we received $176,636 from the IRS related to our income tax receivable.

58.     On January 29, 2010, the Company issued a press release reporting results for the quarter ended December 31, 2009.  The Company reported a net loss of $11.7 million or $0.12 per share on revenues of $10.1 million, and income taxes receivable of $366,000.  The press release failed to disclose that a substantial portion of the income taxes receivable would likely need to be returned to the IRS.

59.     On February 9, 2010, First Marblehead filed its Quarterly Report on Form 10-Q with the SEC for the period ended December 31, 2009.  The Form 10-Q was signed by defendants Meyers and Klipper, and reaffirmed the Company's misleading financial results announced on January 29, 2010.  The Form 10-Q included SOX certifications signed by defendants Meyers and Klipper that were substantially similar to the certifications described *supra*.  The Form 10-Q again misleadingly implied that the Trust Certificate sale reduced the Company's financial uncertainties, and again misleadingly touted the purported tax benefits resulting from the sale.  The Form 10-Q stated, in relevant part:

> Effective March 31, 2009, we sold the trust certificate (Trust Certificate) of our subsidiary NC Residuals Owners Trust, formerly known as GATE Holdings, Inc., a statutory trust that owned certain certificates of beneficial ownership interests of the NCSLT Trusts.  The NCSLT Trusts held substantially all of the private education loans previously securitized by us and guaranteed by The Education Resources Institute, Inc. (TERI), a not-for-profit organization.  As a result of the sale, we are no longer entitled to receive residual cash flows, also known as residuals, from the NCSLT Trusts.  However, we continue to be entitled to receive residuals from other trusts, and we are entitled to receive asset servicing fees for our services that support the purchasers' ownership of the Trust Certificate. In addition, during fiscal 2009, we began to receive service fees for stand-alone services for loan origination, default prevention and collections services.

*   *   *

*During fiscal 2009, we implemented a plan to adjust our business model and address some of the uncertainties facing us.  We made major changes in senior management, significantly reduced our operating expenses and sold the Trust Certificate.*  The sale of the Trust Certificate, coupled with operating losses for fiscal 2009, generated a refund in October 2009 from the Internal Revenue Service for income taxes previously paid of $176,636 and is expected to eliminate certain future tax liabilities.

*   *   *

As a result of the sale of the Trust Certificate effective March 31, 2009, as well as our operating losses for fiscal 2009, we recorded an income tax receivable for federal income taxes paid on prior taxable income. In the first six months of fiscal 2010, we received a total of $189,310 in federal and state income tax refunds related to our income tax receivables.

60.    On April 23, 2010, the Company issued a press release reporting results for the quarter ended March 31, 2010.  The Company reported a net loss of $29.4 million, or $0.30 per share, on revenues of ($16.8) million, and income taxes receivable of $3.8 million.  The press release failed to disclose that a substantial portion of the income taxes receivable would likely need to be returned to the IRS.

61.    On May 10, 2010, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2010, which misleadingly reaffirmed the Company's previously announced financial results.  The Form 10-Q included SOX certifications, signed by defendants Meyers and Klipper, substantially similar to the certifications described supra.  The Form 10-Q noted that the Company received over $189 million in federal and state tax refunds, stemming in part from the sale of the Trust Certificate.  In addition, the Form 10-Q revealed that the IRS began an audit of three years of First Marblehead's tax returns for fiscal years 2007-2009, but did not disclose any details concerning the severity of the potential consequences of the audit if the IRS deemed the tax treatment of its Trust Certificate sale inappropriate.  The Form 10-Q stated, in relevant part:

In the first nine months of fiscal 2010, we received $189.3 million in federal and state tax refunds on income taxes previously paid by us on prior taxable income. The refunds resulted from our losses from operations and the sale of the Trust Certificate.

During the third quarter of fiscal 2010, the Internal Revenue Service, or IRS, began an audit of our federal tax returns for fiscal 2007, 2008 and 2009. The IRS or a state taxing authority could challenge our tax positions in connection with the transactions, notwithstanding our receipt of any tax refund.

62.     On August 16, 2010, the Company issued a press release reporting quarterly and annual results for the period ended June 30, 2010.  The Company reported a net loss of $10.4 million or $0.10 per share for the quarter, and a net loss of $145.5 million or $1.46 per share for the fiscal year.  The Company also reported income taxes receivable of $17.5 million.  The press release failed to disclose that a substantial portion of the income taxes receivable would likely need to be returned to the IRS.

63.     On September 2, 2010, the Company filed its Annual Report on Form 10-K with the SEC for the period ended June 30, 2010.  The Form 10-K was signed by defendants Meyers, Klipper, Anbinder, Bekavac, Berkley, Cameron, Cornell, Daly, Drotch, Eddy, and Hansen, and misleadingly reaffirmed the Company's previously announced financial results and included SOX certifications, signed by defendants Meyers and Klipper, that were substantially similar to the certifications described *supra*.  The Form 10-K reiterated that the IRS had commenced an audit but improperly provided no information concerning the likely devastating consequences.   In commenting on its potential income tax liabilities the Company stated, in relevant part:

We are subject to U.S. federal income tax, as well as income tax in multiple U.S. state and local jurisdictions. During April 2010, the Internal Revenue Service commenced an audit of our tax returns for fiscal years 2007, 2008 and 2009.  We cannot predict the timing or outcome of the audit at this time. Our state income tax returns for the year ended June 30, 2004, and state and federal income tax returns for the years ended June 30, 2005 and 2006, remain subject to examination.

64.     On November 4, 2010, the Company issued a press release reporting results for the quarter ended September 30, 2010.  The Company reported a net loss of $10.6 million, or $0.11 per share.

65.     On November 9, 2010, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2010.  The Form 10-Q included SOX certifications signed by defendants Meyers and Klipper that were substantially similar to those described *supra*. The Form 10-Q reaffirmed the Company's financial results announced on November 4, 2010, and again disclosed that the Company was being audited by the IRS.  The Form 10-Q was misleading because it did not disclose the likely severe outcome of the audit.  The Form 10-Q stated, in relevant part:

> During April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal years 2007, 2008 and 2009. In connection with the October 1, 2010 tax refund, the IRS has expanded its audit to include fiscal year 2010. We cannot predict the timing or outcome of the audit at this time. As of the date of this quarterly report, no adjustments had been proposed by the IRS.

66.     On February 1, 2011, the Company issued a press release reporting results for the quarter ended December 31, 2010. The Company reported a net loss of $1.5 million, or $0.01 per share, and income taxes payable of $25.8 million.  The press release failed to disclose that the actual income taxes payable for the quarter would likely be substantially higher than disclosed at the time.

67.     On February 9, 2011, the Company filed its Quarterly Report on Form 10-Q with the SEC for the quarter ended December 31, 2010.  The Form 10-Q misleadingly reaffirmed the Company's previously announced financial results and included SOX certifications signed by defendants Meyers and Klipper that were substantially similar to the certifications described *supra*. The Form 10-Q again misleadingly failed to disclose the likely devastating effects of the IRS audit, stating, in relevant part:

> In April 2010, the IRS commenced an audit of our tax returns for fiscal years 2007, 2008 and 2009. In connection with its audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related tax refund previously received by us. The IRS has also expanded its audit to include our fiscal year 2010 tax returns in light of the refund that we received in October 2010. We cannot predict the timing or outcome of the audit at this time. No adjustments have been proposed by the IRS.

68.     On May 16, 2011, the Company issued a press release reporting results for the quarter ended March 31, 2011.  The Company reported a net loss of $39.3 million, or $0.39 per share, and income taxes payable of $40.3 million.  The press release failed to disclose that the actual income taxes payable for the quarter would likely be substantially higher than disclosed at the time.

69.     Also, on May 16, 2011, the Company filed its Quarterly Report on Form 10-Q with the SEC for the quarter ended March 31, 2011.  The Form 10-Q misleadingly reaffirmed the Company's previously announced financial results and included SOX certifications, signed by defendants Meyers and Klipper, substantially similar to the certifications described *supra*.  The Form 10-Q misleadingly suggested that the only reason the IRS began auditing the Company was because First Marblehead exceeded a certain refund threshold.  The Form 10-Q stated, in relevant part:

> As a result of the sale of the Trust Certificate, which was effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years.  In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables.  In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for taxable years 2007, 2008 and 2009.  Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to audit a taxpayer who claims and receives a tax refund of a specified magnitude.  In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us.  The IRS has also expanded its audit to include our fiscal 2010 tax return in light of the $45.1 million tax refund that we received in October 2010.  We cannot predict the timing or outcome of the IRS audit.  As of March 31, 2011, the IRS has not proposed any adjustments in connection with its audit.

70.     On August 30, 2011, the Company issued a press release reporting results for the quarter and full year ended June 30, 2011.  The Company reported a quarter net loss of $83.8 million, or $0.83 per share, and an annual net loss of $221.6 million, or $2.20 per share, and income taxes payable of $39.9 million. The press release failed to disclose that the actual income taxes payable for the quarter would likely be substantially higher than disclosed at the time.

71.     On September 8, 2011, the Company filed its Annual Report on Form 10-K with the
SEC for the fiscal year ended June 30, 2011.  The Form 10-K was signed by defendants Meyers,
Klipper, Bekavac, Berkley, Cameron, Cornell, Daly, Drotch, Eddy, and Hanson, and misleadingly
reaffirmed the Company's previously announced financial results.  The Form 10-K included SOX
required certifications, signed by defendants Meyers and Klipper, substantially similar to the
certifications described supra.  The Form 10-K generally disclosed the Company's accounting
methods for recognition of deferred income taxes but misleadingly did not disclose any details
concerning the potential magnitude of the adjustments that could be required in relation to the sale of
the Trust Certificate.  The Form 10-K stated, in relevant part:

> In determining a provision for income taxes, we base our estimated annual effective
> tax rate on expected annual income, statutory tax rates, our ability to utilize net
> operating loss carry forwards and tax planning opportunities available to us in the
> various jurisdictions in which we operate. The estimated annual effective income tax
> rate also includes our best estimate of the ultimate outcome of income tax audits.
>
> We use the asset and liability method of accounting for recognition of deferred
> income taxes.  Under the asset and liability method, we recognize deferred tax assets
> and liabilities in connection with the tax effects of temporary differences between our
> financial statement carrying amounts of existing assets and liabilities and their
> respective tax bases and operating loss carrybacks and carryforwards.  We measure
> deferred tax assets and liabilities using enacted tax rates expected to apply to taxable
> income in the years in which those temporary differences are expected to be
> recovered or settled.  We recognize the effect of a change in tax rates on deferred tax
> assets and liabilities as tax expense (benefit) in the period that includes the enactment
> date.  We establish a deferred tax asset valuation allowance if we consider it more
> likely than not that all or a portion of the deferred tax assets will not be realized.

72.     On November 3, 2011, the Company issued a press release reporting results for the
quarter ended September 30, 2011.  The Company reported a net loss of $88 million, or $0.87 per
share.

73.     On November 8, 2011, the Company filed its Quarterly Report on Form 10-Q with
the SEC for the quarter ended September 30, 2011.  The Form 10-Q included SOX certifications
signed by defendants Meyers and Klipper, substantially similar to the certifications described supra.

The Form 10-Q reaffirmed the Company's previously announced financial results and again misleadingly suggested that the IRS audit was only initiated because the Company crossed a certain threshold for its tax returns.  The Form 10-Q stated, in relevant part:

> As a result of the sale of the Trust Certificate, effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income tax paid on taxable income in prior taxable years.  In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables.  In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for taxable years 2007, 2008 and 2009.  Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to audit a taxpayer who receives a tax refund in excess of $2.0 million.  In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us.  The IRS has also expanded its audit to include our fiscal 2010 tax return in light of the $45.1 million tax refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of September 30, 2011, the IRS had not proposed any adjustments in connection with its audit.

74.     On January 31, 2012, the Company issued a press release reporting results for the period ended December 31, 2011.  The Company reported net income of $1.19 billion or $10.82 per share, which was driven by the sale of the Company's variable interests in the NCSLT Trusts.  As a result of the sale, the Company reported deconsolidated assets totaling $6.6 billion and liabilities totaling $7.8 billion, resulting in a non-cash gain of $1.24 billion. The press release failed to disclose that the Company's net income would likely be drastically reduced a result of First Marblehead's improper recognition of the Trust Certificate sale.

75.     On February 9, 2012, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended December 31, 2011.  The Form 10-Q included SOX certifications, signed by defendants Meyers and Klipper, substantially similar to the certifications described in *supra*. The Form 10-Q reaffirmed the Company's previously announced financial results and disclosed that in addition to the IRS audit, the  Company was "involved in several matters before the ATB relating to the Massachusetts tax treatment of GATE," a statutory trust that owned certain certificates of

beneficial ownership interests, including the Trust Certificate.  The Form 10-Q stated, in relevant

part:

> We are subject to federal income tax, as well as income tax in multiple U.S. state and
> local jurisdictions.  Our effective income tax rate is calculated on a consolidated
> basis.  The securitization trusts are considered pass-through entities for income tax
> purposes and, accordingly, the net income or loss of the trusts is included in the tax
> returns of the trust owners rather than the trust entities themselves.  As such, we
> record all income tax benefit or expense in our Education Financing segment.
>
> The IRS has begun an audit of our tax returns for fiscal 2007, fiscal 2008, fiscal 2009
> and fiscal 2010.  In addition, we are involved in several matters before the ATB
> relating to the Massachusetts tax treatment of GATE, a former subsidiary of [First
> Marblehead].  See Note 10, "Commitments and Contingencies—Income Tax
> Matters," in the notes to our unaudited consolidated financial statements included in
> Part I of this quarterly report for additional information regarding these matters. Our
> state income tax returns in jurisdictions other than Massachusetts remain subject to
> examination for various fiscal years ended between June 30, 2007 and June 30, 2010.
>
> Income tax benefit for the three and six months ended December 31, 2011 was $12.2
> million and $11.4 million, respectively. The benefit of $12.2 million recorded in the
> three months ended December 31, 2011 related to the order issued by the ATB on
> November 9, 2011 related to the Massachusetts tax treatment of GATE. Beginning in
> fiscal 2011, we no longer had any remaining taxes paid within available net operating
> loss carryback periods to offset our losses. As a result, we recorded a deferred tax
> asset for net operating loss carryforwards as of December 31, 2011. It is more likely
> than not that our deferred tax assets will not be fully realized through future reversals
> of existing taxable temporary differences or available tax planning strategies.
> Accordingly, we have determined that a valuation allowance is necessary for all of
> our deferred tax assets not scheduled to reverse against existing deferred tax
> liabilities as of December 31, 2011. In addition, we recorded accrued interest related
> to unrecognized tax benefits for the second quarter of fiscal 2012. We will continue
> to review the realizability of deferred tax assets on a quarterly basis.

76.     On May 2, 2012, the Company issued a press release reporting results for the period

ended March 31, 2012. The Company reported net income of $9.9 million or $0.09 per share, and

income taxes payable of $23.7 million.  The Company stated, "[t]he improvement in earnings of

$49.2 million was largely driven by a $26.4 million decrease in the loss from operations combined

with an increase of $23.4 million in other income."  The press release failed to disclose that the

actual income taxes payable for the quarter would likely be substantially higher than disclosed at the time.

77.     On May 10, 2012, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2012.  The Form 10-Q included SOX certifications, signed by defendants Meyers and Klipper, substantially similar to the certifications described *supra*.  The Form 10-Q reaffirmed the Company's previously announced misleading financial results and misleadingly downplayed the nature and scope of the IRS audit.  The Form 10-Q stated, in relevant part:

> As a result of the sale of the trust certificate of NC Residuals Owners Trust (the Trust Certificate), effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years.  In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables. In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal 2007, fiscal 2008 and fiscal 2009. Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to audit a taxpayer who receives a tax refund in excess of $2.0 million. In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us. The IRS has also expanded its audit to include our tax return for fiscal 2010 in light of the $45.1 million tax refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of March 31, 2012, the IRS had not issued any notice of proposed adjustment in connection with its audit.

78.     On August 14, 2012, the Company issued a press release reporting results for the quarter and full year ended June 30, 2012.  The Company reported a net loss of $14 million, or $0.14 per share, for the fourth quarter, a net loss of $38.9 million or $0.35 per share for the fiscal year ended June 30, 2012, and income taxes payable of $23.4 million.  The press release failed to disclose that the actual income taxes payable for the quarter would likely be substantially higher than disclosed at the time.

79.     On September 12, 2012, the Company filed its Annual Report on Form 10-K with the SEC for the quarter ended June 30, 2012.  The Form 10-K reaffirming the Company's previously

announced misleading financial results, was signed by defendants Meyers, Klipper, Bekavac, Cameron, Daly, Drotch, Eddy, and Hanson, and included SOX certifications, signed by defendants Meyers and Klipper, substantially similar to the certifications described *supra*.  The Form 10-K noted that the IRS "could challenge [the Company's] tax position in connection [with the sale of the Trust Certificate]," but did not disclose the likelihood that the IRS would deem the Company's reported tax treatment as inappropriate, nor the substantial liability that First Marblehead faced as a result.

80.     Between November 1, 2012 and May 10, 2013, the Company released at least three press releases and two quarterly reports reporting income taxes payable of only approximately $24 million, and failing to disclose information concerning the potential severity of the continuing IRS audit, including with respect to the Company's potential liability.  The press releases and quarterly reports failed to disclose that the actual income taxes payable for the quarter would likely be substantially higher than disclosed at the time.

## THE TRUTH IS REVEALED

81.     On August 15, 2013, the Company shocked the market by issuing a press release announcing that the Company expected to receive a NOPA from the IRS that would: (i) seek to disallow the loss that generated the tax refunds previously received by the Company; and (ii) require the Company to include in its tax returns any taxable income of the Trust Certificate from the March 31, 2009 sale date through June 30, 2011.  The press release further disclosed that the proposed tax liability related to its IRS audit was estimated to amount to a staggering $300 million, plus interest. The massive tax liability is nearly ***750% more than the Company's total revenue for all of fiscal year 2012*** of approximately $40.4 million, and more than ***674% greater than the Company's total***

*revenue for all of fiscal year 2013* of approximately $44.4 million.  The press release stated, in

relevant part:

> As previously disclosed, our federal income tax returns have been under audit by the Internal Revenue Service (the "IRS") in connection with the sale of the trust certificate of the NC Residual Owners Trust ("Trust Residuals"). As part of that audit process, the Company expects to receive a Notice of Proposed Adjustment ("NOPA"). The NOPA, when issued, is an initial IRS position and not a final determination, and as a result, does not require any tax payment at this time.
>
> The Company expects that the NOPA would seek to disallow the loss that generated the tax refunds previously received by the Company as well as require the Company to include in its tax returns any taxable income of the Trust Residuals from the March 31, 2009 sale date through June 30, 2011. The disallowance of the loss, coupled with the additional taxable income after the sale date, creates a proposed adjustment which we estimate to be approximately $300 million plus interest.

82.     On the above news, the Company's market capitalization plummeted by more than

$63.5 million, wiping out over 36% in a single day of trading.

83.     On September 13, 2013, the Company filed its Annual Report on Form 10-K with the

SEC for the year ended June 30, 2013.  The Form 10-K revealed that in light of the ongoing audits,

First Marblehead could not assure the investing public that the Company had enough resources to

satisfy its operating needs for the following year.  The Form 10-K also revealed that on September

10, 2013, the Company received two NOPAs from the IRS containing the proposed adjustments

previously announced.  According to the Company, the NOPAs stated that the IRS maintains that the

Trust Certificate sales "should not be recognized for federal income tax purposes primarily because

[First Marblehead] retained the economic benefits and burdens of the Trust Certificate, including,

among other things, retaining certain repurchase rights and data rights."  In addition, the Company

revealed that the "IRS further concludes that the transaction should be characterized as a financing

instead of a sale and asserts that the sale of the Trust Certificate and the execution of the Asset

Services Agreement had the impact of converting taxable income to the owner from an accrual basis

to a cash basis."  As a result, the Company would likely be liable for federal income tax adjustments

estimated to be approximately $300 million plus interest, with the interest continuing to accrue until the matter is resolved. The Form 10-K further noted that as of June 30, 2013, the Company had combined cash, cash equivalents, and short-term investments of only $137.1 million, far below the potential tax liability of $300 million plus interest. Finally, the Form 10-K noted that the ongoing IRS audit or any other investigation could result in substantial costs, and that a state taxing authority could also challenge the Company's tax position in connection with the sale of the Trust Certificate.

84.     On September 27, 2013, First Marblehead revealed in a Form 8-K that the Company was notified by the NYSE that the average closing price of the Company's common stock over a consecutive thirty-trading-day period had fallen below the NYSE's continued listing standard of $1.00 per share. As of September 20, 2013, the average closing price of the Company's common stock over a consecutive 30-trading-day period was $0.98 per share. The Company has a period of six months from the date of notice to satisfy the average share price requirement.

## REASONS THE STATEMENTS WERE MISLEADING

85.     Throughout the relevant period, the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that the tax refund claimed by the Company did not comport with relevant legal requirements.

86.     The Individual Defendants also knew, consciously disregarded, or were reckless in not knowing that IRS would not likely allow the Company's claimed tax benefits because First Marblehead was required to treat the Trust Certificate as an asset under tax regulations due to the fact that the Company retained certain benefits and significant control over the Trust Certificate after the sale.

87.     Finally, the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that First Marblehead's business was not as well positioned financially as the

defendants represented and the Company was not on track to achieve the more than half a billion dollars in tax benefits that the Individual Defendants had led the market to expect.

## DAMAGES TO FIRST MARBLEHEAD

88.     As a result of the Individual Defendants' improprieties, First Marblehead disseminated improper, public statements concerning the Company's business prospects.  These improper statements have demolished First Marblehead's credibility, corporate image, and goodwill as reflected by the Company's over $274.6 million, or more than 71% market capitalization loss between the Company's recent high on April 22, 2010, and August 16, 2013, the date the Company first disclosed its potential liability to the IRS.

89.     First Marblehead's tax accounting and reporting issues also damaged its reputation within the business community and in the capital markets.  In addition to price, First Marblehead's current and potential business partners consider a company's ability to properly account for and disclose material financial information.  Businesses are less likely to work with companies that have internal control problems.  First Marblehead's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

90.     Further, as a direct and proximate result of the Individual Defendants' actions, First Marblehead has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending First Marblehead and certain officers and directors in the Securities Action;

(b)     costs incurred from paying any potential settlement or adverse judgment in the Securities Action;

(c)     costs incurred in the ongoing IRS audit or any other investigation, audit, appeals proceeding or suit relating to the sale of the Trust Certificate;

(d)     substantial interest likely to be owed to the IRS as a result of the Company's failure to timely pay taxes owed relating to the sale of the Trust Certificate;

(e)     costs incurred from investigating and remedying the Company's internal control deficiencies; and

(f)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to First Marblehead.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91.     Plaintiff brings this action derivatively in the right and for the benefit of First Marblehead to redress injuries suffered, and to be suffered, by First Marblehead as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  First Marblehead is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

92.     Plaintiff will adequately and fairly represent the interests of First Marblehead in enforcing and prosecuting its rights.

93.     Plaintiff was a shareholder of First Marblehead at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current First Marblehead shareholder.

94.     The current Board of First Marblehead consists of the following seven individuals: defendants Meyers, Drotch, Daly, Hansen, Eddy, Cameron, and Bekavac. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Current Board Faces a Substantial Likelihood of Liability for Their Misconduct**

95.     As admitted in the Company's Forms 10-Q dated November 9, 2007, February 11, 2008, and May 12, 2008, and the Company's Form 10-K dated August 29, 2008, the Individual Defendants knew that First Marblehead was only allowed to recognize the tax benefit from an uncertain tax position "if it [was] *more likely than not that the tax position will be sustained upon examination by the taxing authorities*, based on the technical merits of the tax position." Indeed, defendants Meyers, Drotch, Daly, Hansen, and Cameron were on the Board when the Company disclosed in 2007 and 2008 that First Marblehead faced repeated IRS examinations of its local, state, and federal income tax returns for the fiscal years 2003 through 2008. The Company disclosed the existence of these audits in six Forms 10-Q filed between November 9, 2007 and May 8, 2009, three of which were signed by defendant Meyers. The Company also disclosed the existence of these audits in two Forms 10-K filed August 29, 2008 and September 3, 2009, which were signed by defendants Meyers, Klipper, Tarr, Anbinder, Berkley, Cameron, Cornell, Daly, Drotch, and Hansen. The Director Defendants thus knew that the IRS would closely scrutinize tax treatment of the Trust Certificate sale. As detailed herein, however, the Director Defendants breached their fiduciary duties by reviewing and approving the sale as constructed and then repeatedly issuing misleading statements, including in Forms 10-K signed by each of them, that failed to disclose: (i) the high unlikelihood that the IRS would allow for the hundreds of millions of dollars of refunds and loss accruals claimed by First Marblehead as a result of its sales of the Trust Certificate; and (ii) the tax

refund claimed by the Company did not comport with relevant legal requirements.  Accordingly, demand is rendered futile as to defendants Meyers, Drotch, Daly, Hansen, Eddy, Cameron, and Bekavac.

96.     Defendants Daly, Drotch, Eddy, Bekavac, and Hansen face a substantial likelihood of liability for their misconduct as members of First Marblehead's Audit Committee.  These defendants were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and First Marblehead's internal controls over financial reporting.  Despite these duties, defendants Daly, Drotch, Eddy, Bekavac, and Hansen knowingly or recklessly reviewed and approved the improper statements and guidance alleged herein.  Upon information and belief, defendants Daly, Drotch, Eddy, Bekavac, and Hansen discussed the Company's tax position with respect to the sale of the Trust Certificate during Audit Committee meetings, and whether the IRS was more likely than not to sustain the Company's position.  As a result, the Audit Committee Defendants knew or consciously disregarded that the IRS was unlikely to allow the Company to realize the refunds and loss accruals claimed as a result of the sale of the Trust Certificate. Accordingly, defendants Daly, Drotch, Eddy, Bekavac, and Hansen face a substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

97.     Defendants Cameron, Daly, Berkley, and Hansen face a substantial likelihood of liability for their misconduct as members of First Marblehead's Compensation Committee.  In September 2010, these defendants granted defendant Meyers a $2 million special bonus, in part because defendant Meyers purportedly "significantly improve[ed] the viability of the Company, as demonstrated by … the potential elimination of an estimated $430,000,000 in additional taxes over the remaining life of the NCSLT Trusts."  In September 2010, the Compensation Committee also granted defendant Meyers 1.2 million fully vested stock units worth over $4.1 million.  As with the

above special bonus, the stock units were also granted in part as a result of the potential elimination of an estimated $430 million in taxes. The stock units were further granted because the sale of the Trust Certificate purportedly provided the Company with tax refunds of over $176.6 million for fiscal 2009. At the time of the above grants, defendants Cameron, Daly, Berkley, and Hansen knew or were reckless in not knowing that the purported tax benefits from the sale of the Trust Certificate were likely to be rejected by the IRS. The windfall granted to defendant Meyers was therefore improper. In addition to the above, defendant Meyers also faces a substantial likelihood of liability for accepting these staggering compensation grants that he knew or was reckless in not knowing were undeserved.

98.     The acts complained of constitute violations of the fiduciary duties owed by First Marblehead's officers and directors and these acts are incapable of ratification. Plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

99.     Plaintiff has not made any demand on the other shareholders of First Marblehead to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     First Marblehead is a publicly held company with over 112.7 million shares of common stock outstanding and thousands of shareholders;

(b)     making demand on such a large number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    The Individual Defendants owed and owe First Marblehead fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe First Marblehead the highest obligation of good faith, fair dealing, loyalty, and due care.

102.    Each of the Individual Defendants violated and breached their fiduciary duties.  More specifically, the Individual Defendants violated their duty of loyalty by creating a culture of lawlessness within First Marblehead, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

103.    Defendants Meyers and Klipper as Officer Defendants, knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's conference calls, press releases, and public filings concerning the Company's business prospects; and (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.

104.    The Director Defendants, Meyers, Drotch, Daly, Hansen, Eddie, Cameron, Bekavac, Anbinder, Tarr, Berkley, and Cornell, as directors of the Company, owed First Marblehead the highest duty of loyalty.  The Director Defendants knowingly or recklessly breached their duty of loyalty by signing the Company's Forms 10-K that they knew or were reckless in not knowing were improper and/or misleading, and by failing to ensure that reliable systems of reporting were in place at the Company.

105.    The Audit Committee Defendants, Daly, Drotch, Eddy, Bekavac, and Hansen,

breached their fiduciary duty of loyalty by approving the statements and financial guidance described herein that were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing were improper. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Daly, Drotch, Eddy, Bekavac, and Hansen failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

106.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, First Marblehead has sustained substantial damages, including direct monetary damages and damages to its reputation and goodwill in the capital markets. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

107.    Plaintiff, on behalf of First Marblehead, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Action that they brought on with their improper statements. In addition, the Individual Defendants have caused First Marblehead to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

110.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

111.    Plaintiff, on behalf of First Marblehead, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of First Marblehead.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to First Marblehead.

114.    Plaintiff, as a shareholder and representative of First Marblehead, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

115.    Plaintiff, on behalf of First Marblehead, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of First Marblehead, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.    Directing First Marblehead to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect First Marblehead and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the

Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

      1.      a proposal to strengthen the Company's disclosure and financial controls, including with respect to the Company's evaluation and disclosure of its tax position and potential tax liabilities;

      2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

      3.      a provision to permit the shareholders of First Marblehead to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of First Marblehead has an effective remedy;

D.      Awarding to First Marblehead restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 23, 2013

HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP


/s/Theodore M. Hess-Mahan
Theodore M. Hess-Mahan
BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726
thess-mahan@hutchingsbarsamian.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
JOAN M. RABUSTO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
jrabusto@robbinsarroyo.com

Attorneys for Plaintiff

898845